J-A12034-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| NAFEESE TURNER, | |
| Appellant | No. 2601 EDA 2014 |

Appeal from the Judgment of Sentence August 8, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0014345-2013

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                **FILED JUNE 09, 2016**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant's conviction by a jury on the charges of aggravated assault, carrying a firearm without a license, carrying firearms in public in Philadelphia, possessing an instrument of crime, and conspiracy.[1]  Appellant presents sufficiency of the evidence claims.  We affirm.

The relevant facts and procedural history are as follows:  Appellant was arrested and, represented by counsel, he proceeded to a jury trial with

_____

[1] 18 Pa.C.S.A. §§ 2702(a)(1), 6106(a)(1), 6108, 907(a), and 903(c), respectively.  The jury acquitted Appellant on the charges of attempted murder, 18 Pa.C.S.A. § 901(a), and conspiracy (to commit attempted murder), 18 Pa.C.S.A. § 903(c).

_____

*Former Justice specially assigned to the Superior Court.

Markel Davis ("Davis") as his co-defendant. At trial, the Commonwealth offered the testimony of several witnesses; however, the defense offered no witnesses.

Specifically, Police Officer Robert Ellis testified that, on September 9, 2013, he was on patrol with his partner, Police Officer Cyrus Pollard, when they received a radio call for shots fired initially "in the 1800 block of Corlies Street, and then. . .3018 Mifflin Street[,]" which is in a "nice neighborhood." N.T., 5/7/14, at 139, 148. Officer Ellis testified the officers arrived at the 3018 Mifflin Street residence within three to five minutes of receiving the radio call, and they were the third police vehicle to arrive. *Id.* at 140. Officer Ellis exited the police vehicle and followed other responding officers into the house where he immediately noticed Enrico Lofton ("Lofton") had been shot in the arm. *Id.* at 141. Lofton yelled out, "I was in a[n] argument." *Id.* at 170, 176. Officer Ellis also observed a male teenager, who was small, thin, and light-skinned, inside of the house. *Id.* at 141, 144. However, since Lofton was clearly in pain and bleeding profusely, Officer Ellis' focus remained on Lofton. *Id.* at 141-143. Officer Ellis assisted Lofton to a police vehicle and then transported him to the hospital, where hospital personnel discovered narcotics on Lofton's person. *Id.* at 145.

Officer Ellis indicated that, during the transport, Lofton said he was shot in the driveway of 1818 Corlies Street, which is approximately 150 feet from 3018 Mifflin Street, and his "little brother" was with him during the

shooting. *Id.* at 150-51, 164. Upon arrival at the hospital, Lofton provided the police with a description of two men, who were involved in the shooting. *Id.* at 166-67, 176. Specifically, Lofton told the officers two black males were involved, both of whom wore dark clothing. *Id.* at 167. Lofton further indicated one of the men was approximately 5'10'' tall, weighed approximately 180 pounds, and had a full beard. *Id.* Lofton then asked the officers if his "little brother" was still in the house, and Officer Ellis assumed he was talking about the teenager he had noticed previously in the house. *Id.* at 164. Officer Ellis and his partner immediately radioed to their fellow officers all of the information that they had gathered from Lofton. *Id.* at 167.

Officer Pollard confirmed that upon arrival Officer Ellis ran into the house at 3018 Mifflin Street; however, he remained outside. *Id.* at 179. At the hospital, he was present when a package of narcotics fell out of Lofton's pocket as hospital personnel were cutting off his clothes. *Id.* at 181.

Lofton testified he was convicted of "dealing heroin" in 2011 and 2012, and he was on probation when he was shot on September 9, 2013. N.T., 5/8/14, at 23-24. Lofton testified that he spent a lot of time with his paramour, and he treated her fifteen-year-old brother, Carlos, as his little brother. *Id.* at 25-27. He indicated he took Carlos "under [his] wing like [a] little brother." *Id.* at 27.

At some point, Lofton's paramour's mother talked to him about the fact Carlos was "running the streets and selling drugs." *Id.* Because Lofton did not want to see Carlos follow in his footsteps, he talked to the teenager, who told him the people for whom he was selling drugs. *Id.* at 27-28. Carlos also turned over to Lofton a pack of crack cocaine, which the men had given him to sell. *Id.* at 30.

Lofton decided to confront the men, so about two weeks prior to the shooting, during the daylight hours, he travelled with Carlos to Mifflin Street. Carlos then pointed out the two people for whom he was selling drugs. *Id.* at 28-29. Lofton confirmed the two men to which Carlos pointed were Appellant and Davis. *Id.* at 29.

Lofton testified he walked up to the two men, stood four feet from them, told them to leave Carlos alone because he was "too young for the business," and gave them back the crack cocaine. *Id.* at 30-31. Lofton indicated the two men were standing "side by side," he could clearly see their faces, and when he told them to leave the teenager alone, Davis said he "respected that." *Id.* at 32. Lofton said he then "fist bumped" the two men and left the conversation on good terms. *Id.* at 33.

However, two weeks later, Lofton was inside the residence at 3018 Mifflin Street watching a football game when he heard a commotion going on outside. *Id.* at 34. He went outside and saw Carlos standing with Appellant and Davis. *Id.* Lofton then testified the following occurred:

**Q:** And what did you do when you went outside?
**A:** Confronted them again.
*** 
**Q:** What did you say?
**A:** We started arguing back and forth.
***
**Q:** Carlos there?
**A:** Yes.
**Q:** And what did you find out at that time?
**A:** That he gave Carlos something.
**Q:** I can't understand you.
**A:** He gave Carlos drugs, and I asked Carlos where it's at, and he acted like he didn't want to give it to me, so I took it from him.

**THE COURT:** I'm sorry. I didn't hear that.

**Q:** You [have] to speak up, [Lofton].

**A:** What I say—I said I guess they gave Carlos drugs again, and I asked Carlos where was it at, and he said he's not giving it to me. So I checked Carlos and I took it from him.

**Q:** Did Carlos have drugs on him?
**A:** Yes.
**Q:** What kind of drugs did he have on him then?
**A:** Heroin.
**Q:** Anything else?
**A:** Crack.
**Q:** And where was it that you took [the drugs] from him?
**A:** His waistband.
**Q:** Did he tell you—did Carlos tell you anything about what they were arguing over?
**A:** No.
***
**Q:** So you took the drugs from Carlos. What did you do with them?
**A:** I told them they ain't getting them back.
**Q:** You told who they ain't getting them back?
**A:** Those two.
**Q:** Indicating the defendants, [Davis and Appellant]?
**A:** Yes.
**Q:** What did they do—or what did they say when you said that?
**A:** They said, who the fuck I think I am, and that's when I said—
**Q:** I need you to talk—

**A:** They asked who the fuck do I think I am, and I asked who the fuck they think they be.

**Q:** Okay. So then what happened?

**A:** I don't remember, just standing there, but—I forgot what they said, but that's when they rode off and I walked off. And shots were fired.

**Q:** Who said that? Who said, "Who the F do you think you are?"

**A:** I believe [Appellant].

**Q:** [Appellant] said that? Did [Davis] say anything?

**A:** No. He just looking stupid.

**Q:** I'm sorry.

**A:** He looking stupid.

**Q:** How far apart were they when [Appellant] said that?

**A:** Side by side, I guess. Side by side.

**Q:** Side by side?

**A:** Yes.

\*\*\*

**Q:** I'm going to ask you again to tell me when to stop as I walk closer when how far—close they were—

**A:** Where you were there before.

**Q:** Same spot?

**A:** Same spot.

**Q:** About four feet away from you?

**A:** Yes.

**Q:** Were they both side by side then?

**A:** Yes.

**Q:** Anything covering their faces?

**A:** No.

**Q:** Were there lights on where you were?

**A:** Street lights.

**Q:** Okay. What did they say to you, if anything, about the drugs that you took from Carlos?

**A:** I guess they wanted it back, and I told them they ain't getting shit back.

**Q:** When you say "guess," were they asking for it back?

**A:** Yeah.

**Q:** Which one asked for it back?

**A:** [Davis].

**Q:** [Davis]?

**A:** Yeah.

**Q:** What did [Appellant], if anything, say about the drugs?

**A:** Start[ed] running his mouth or something.

**Q:** Okay. Well, I know you already said he was just running his mouth. What was he saying?
**A:** Shit-talking.
**Q:** Like what?
**A:** Cosigning and everything. Cosigning.
**Q:** Cosigning?
**A:** Whatever [Davis] say, he was cosigning.
**Q:** So [Appellant] would repeat what[ever] [Davis] was saying?
**A:** Yeah, something like that.
**Q:** Saying the same exact thing or something different?
**A:** No, something different. . .different way.
**Q:** Can you tell the jury what you heard [Appellant] saying?
**A:** I don't remember right now.
**Q:** What do you remember [Davis] saying?
**A:** "We want our shit back." I said, " You ain't getting your shit back." And he said, "We got something for you." I said, "Come on with it."
**Q:** They said they got something for you?
**A:** Yeah.
**Q:** Which one said that?
**A:** [Davis].
**Q:** Did [Appellant] say anything along those lines?
**A:** No, he just looking dumb.
**Q:** Okay. How far apart was [Appellant] standing when [Davis] said that?
**A:** They was side by side.
**Q:** How long was, as you call it, that "shit-talking" going on?
**A:** Like five minutes.

*Id.* at 35-42.

Lofton testified he told the men he was going to flush the narcotics down the toilet, and they became upset. *Id.* at 43. Lofton watched as the two men, who were "side by side," started to ride off on their bikes, and as he began to walk away in the opposite direction, he turned in time to see Davis shooting in his direction. *Id.* at 45. One of the bullets struck Lofton

in the front of his right bicep, and after he went into the house, his paramour telephoned the police. *Id.* at 47.

Prior to the shooting, Lofton did not observe either of the two men in possession of the handgun. *Id.* at 49. Lofton testified that, the day after the shooting, he picked out Appellant's and Davis' photos from police photo arrays. *Id.* at 56-57. Also, on that date, he gave a statement to the police indicating Davis shot him, but that Appellant was with him and had done "all of the talking." *Id.* at 58-64. At trial, Lofton again identified Davis as the man who shot him, and Appellant as the man who was "with him talking shit when [he was] shot." *Id.* at 69.

Lofton admitted that, at no point, did he observe Appellant in possession of the firearm. *Id.* at 76. However, he indicated that, when he told the men he was not giving the narcotics back to them, Davis said, "We got something for you[,]" and Appellant said to Davis, "Say no more." *Id.* at 106.

Detective Michael Ferry testified the shooting occurred at 1818 South Corlies Street, and the police found three 9 millimeter fired cartridge casings in the vicinity. *Id.* at 120-21.

Detective John Landis confirmed that, the day after the shooting, Lofton chose Appellant's and Davis' photos from photo arrays. *Id.* at 160. Specifically, he confirmed Lofton chose Davis as the shooter, and he chose

Appellant as the person with Davis and "doing all the talking." *Id.* at 164-65.

The Commonwealth offered into evidence various stipulations made between the parties, including the fact that neither Davis nor Appellant had a valid license to carry a firearm. N.T., 5/9/14, at 65-66. The parties also stipulated to the content of telephone calls, which Appellant made from prison. *Id.* 66-67. Specifically, the parties stipulated that, in one telephone call, Appellant asked someone to offer Carlos (or someone in his family) money in exchange for Carlos saying the incident was a "misunderstanding." *Id.* at 67-71; Trial Court Pa.R.A.P. 1925(a) Opinion, filed 6/5/15, at 7.

At the conclusion of all testimony, the jury convicted Appellant of the offenses indicated *supra*. The trial court sentenced Appellant to four years to eight years in prison for aggravated assault, three years to six years in prison for conspiracy, and one year to two years in prison for carrying a firearm without a license, the sentences to run consecutively. No further penalty was imposed for the remaining convictions. This timely appeal followed,[2] and all Pa.R.A.P. 1925 requirements have been met.

Appellant presents sufficiency of the evidence claims. Specifically, he alleges the evidence reveals he was merely present when Davis shot Lofton

---

[2] Davis, who was also convicted and sentenced on numerous charges in connection with the shooting, has filed a separate appeal. His appeal is docketed at 2489 EDA 2014 and shall be addressed in a separate decision.

and, thus, the evidence is insufficient to sustain any of his convictions under a conspiracy or accomplice theory. As to his possession convictions, Appellant offers the alternate argument that the evidence is insufficient to establish he actually or constructively possessed the handgun. Finally, Appellant suggests the lack of evidence is not "sufficiently buttressed by [Appellant's] foolish phone call."

> The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.
>
> However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

*Commonwealth v. Slocum*, 86 A.3d 272, 275-76 (Pa.Super. 2014) (quotation and citation omitted).

We have carefully reviewed the detailed opinion filed by the Honorable Denis P. Cohen, and we conclude it ably addresses and rejects Appellant's challenges to the sufficiency of the evidence. *See* Trial Court Pa.R.A.P. 1925(a) Opinion, filed 6/5/15, at 7-14. Specifically, (1) as to Appellant's conviction for aggravated assault, the trial court rejected Appellant's "mere presence" argument and concluded the evidence is sufficient to sustain Appellant's conviction under an accomplice-liability theory, *Id.* at 7-10; (2) as to Appellant's conviction for conspiracy (to commit aggravated assault), the trial court concluded the evidence is sufficient to sustain Appellant's conspiracy conviction, *Id.* at 10-12;[3] (3) as to Appellant's possessory convictions (carrying a firearm without a license, carrying firearms in public in Philadelphia, and possessing an instrument of crime), the trial court applied our Supreme Court's recent decision in *Commonwealth v. Knox*, - ___ Pa. ___, 105 A.3d 1194 (2014), and concluded that, despite the fact Appellant did not possess the handgun during the shooting, the evidence is sufficient to sustain Appellant's possessory convictions under an offense-specific accomplice-liability theory, *Id.* at 12-13; and (4) as to Appellant's

_____

[3] For further discussion of the elements necessary to sustain a conviction for conspiracy (to commit aggravated assault), see *Commonwealth v. Thomas*, 65 A.3d 939 (Pa.Super. 2013).

- 11 -

conviction for conspiracy (to commit carrying a firearm without a license, carrying firearms in public in Philadelphia, and possessing an instrument of crime), the trial court concluded the evidence is sufficient to establish Appellant conspired with Davis in this regard, *Id.* at 13-14.[4, 5]

We agree with the trial court's reasoning and rely on it for purposes of this appeal. Accordingly, we affirm and direct the parties to attach a copy of the trial court opinion in the event of further proceedings.

Affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/9/2016

_____

[4] For further discussion of conspiracy to commit possessory firearm offenses, see *Commonwealth v. Gross*, 627 Pa. 383, 101 A.3d 28 (2014).

[5] We note the trial court properly considered Appellant's telephone calls, which he made in prison following the shooting, in conducting a sufficiency of the evidence analysis. Trial Court Pa.R.A.P. 1925 Opinion, filed 6/5/15, at 9, 14 n.14. *See Commonwealth v. Bradley*, 69 A.3d 253, 258 (Pa.Super. 2013) ("It has long been recognized that a defendant's attempts to cover up after a crime can be inferred to demonstrate a consciousness of guilt.") (citation omitted).

IN THE COURT OF COMMON PLEAS

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA,

          APPELLEE

v.

Nafeese Turner,

          APPELLANT

COURT OF COMMON PLEAS –
PHILADELPHIA COUNTY
CP–51–CR–0014345–2013

SUPERIOR COURT NO. 2601 EDA 2014

**FILED**

JUN 0 5 2015

Criminal Appeals Unit
First Judicial District of PA

CP-51-CR-0014345-2013 Comm. v. Turner, Nafeese
Statement of Matters Complained on Appeal



7264768191

**OPINION**

## A. PROCEDURAL HISTORY

Following a jury trial between May 7, 2014 and May 12, 2014 before the Honorable Denis

P. Cohen, Judge of the Court of Common Pleas, the jury convicted the above-named defendant of

Aggravated Assault – Causing Serious Bodily Injury,[1] Firearms Not to Be Carried Without a

License,[2] Carrying Firearms in Public in Philadelphia,[3] and Possession of an Instrument of a

Crime.[4] The defendant was also convicted of Criminal Conspiracy to Commit: Aggravated

Assault,[5] Firearms Not to Be Carried Without a License,[6] Carrying Firearms in Public in

---

[1] 18 Pa. C.S. § 2702 §§ A(1) (a felony of the first degree). The jury convicted the defendant of Aggravated Assault by causing serious bodily injury and by attempting to cause serious bodily injury. (N.T. 05/12/14 at 20).
[2] 18 Pa. C.S. § 6106 (a felony of the third degree).
[3] 18 Pa. C.S. § 6108 (a misdemeanor of the first degree).
[4] 18 Pa. C.S. § 907 §§ A (a misdemeanor of the first degree).
[5] 18 Pa. C.S. § 903 §§ C (a felony of the first degree).
[6] 18 Pa. C.S. § 903 §§ C (a felony of the third degree).

Philadelphia,[7] and Possession of an Instrument of a Crime.[8] On August 8, 2014, this Court sentenced the defendant to an aggregate term of eight (8) to sixteen (16) years of incarceration.[9] The defendant filed a Notice of Appeal on September 8, 2014. This Court issued a 1925(b) Order on September 17, 2014.

On October 6, 2014, the defendant filed a Request for an Extension of Time, as the Notes of Testimony had not yet been completed. On January 13, 2015, once the Notes of Testimony were completed, this Court issued an Amended 1925(b) Order, directing the defendant to file a Statement of Matters within fourteen (14) days. The defendant did not file a Statement of Matters. Instead, on January 26, 2015, the defendant filed another Request for an Extension of Time for thirty days (an extension to February 25, 2015) because he claimed that the Notes of Testimony were unavailable. Eventually, on March 3, 2015, the defendant filed a Statement of Matters *nunc pro tunc*. The defendant complains of the following allegations of error in his Statement of Matters:

1. Viewing the evidence in the light most favorable to the Commonwealth, the evidence was insufficient to sustain Appellant's convictions for aggravated assault and conspiracy to commit aggravated assault because:
   a. The evidence only established Appellant's mere presence at the scene of the crime. *See, Commonwealth v. Swerdlow*, 636 A.2d 1173 (Pa. Super. 1994) ("The decided cases have held that mere association or mere presence at the scene of the crime is insufficient to provide a conspiracy unless the defendant had prior knowledge of his alleged co-conspirator's criminal intent. Similarly, defendant's mere knowledge of the proposed crime is insufficient to convict him of conspiracy absent proof that he became an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement") (numerous citations omitted). *See also, Commonwealth v. Brady*, 560 A.2d 802 (Pa. Super 1989)(Brady's mere presence during commission of burglary and sale of stolen property, and his receipt of a portion of the proceeds from the sale,

---

[7] 18 Pa. C.S. § 903 §§ C (a misdemeanor of the first degree).
[8] 18 Pa. C.S. § 903 §§ C (a misdemeanor of the first degree).

[9] This Court sentenced the defendant to consecutive terms of four (4) to eight (8) years imprisonment for Aggravated Assault, three (3) to six (6) years imprisonment for Conspiracy to Commit Aggravated Assault, and one (1) to two (2) years imprisonment for Firearms Not to Be Carried Without a License. This Court imposed no further penalty on the remaining charges.

2

were insufficient to prove that he knowingly and voluntarily participated in commission of the crimes);

b. There was no evidence that Appellant and his co-defendant ever actually formed an agreement to do anything, and to the contrary, the Complainant testified that Appellant made no threats to him, *see* N.T. 5/814 at 93; nor did Appellant even look in the Complainant's direction when shots were fired, *see,* N.T. 5/8/14 at 45;

c. The evidence of Appellant's prison calls did not establish that he entered into a conspiracy with his co-defendant. Specifically, Appellant stated that "Tell him it's a misunderstanding." N.T. 5/9/14 at 119. This evidence is equally consistent with innocence, and as such, does not support a finding of proof beyond a reasonable doubt. *See Commonwealth v. Davis,* 458 A.2d 248 (Pa. Super 1983) (where evidence and reasonable inferences were equally consistent with defendant's innocence the evidence was insufficient to sustain the conviction). *See also, Commonwealth v. Beauford,* 428 A.2d 1000 (Pa. Super. 1981) (standing with others facing a recently jimmied door then fleeing form an approaching police officer was insufficient to prove conspiracy for burglary and trespass).

2. The evidence was insufficient to support Appellant's conviction for aggravated assault on the theory of accomplice liability because there was no evidence that he acted with intent to promote or facilitate the shooting, that he solicited the other person to commit the shooting, or that he aided, agreed, or attempted to aid the other person in planning or committing the shooting. *See,* 18 Pa.C.S. § 306. *Compare, Commonwealth v. McClendon,* 874 A.2d 1223 (Pa. Super 2005) (accomplice liability proven where McClendon actually took part in the gunfight).

3. The evidence was insufficient to support Appellant's convictions for the firearms offenses and possession of an instrument of crime because:

a. The Commonwealth failed to prove that Appellant had joint constructive possession of the firearm that his co-defendant possessed on his person, as Appellant did not have a conscious dominion over the firearm. *See, Commonwealth v. Heidler,* 741 A.2d 213 (Pa. Super. 1999) (Heidley could not have been found to have had the necessary power or intent to control the gun, which was in his girlfriend's purse after he gave it to her); *Commonwealth v. Boatwright,* 453 A.2d 1058 (Pa. Super. 1982) (no constructive possession found even though Boatwright was seen reaching toward the area of the vehicle where the gun was found). *Accord Commonwealth v. Valette,* 613 A.2d 548, 551 (Pa. 1992) (mere presence at the scene is insufficient to prove constructive possession of contraband);

b. The Commonwealth failed to present sufficient evidence that Appellant conspired with his co-defendant to possess the firearm; and,

c. The Commonwealth did not adequately prove Appellant's accomplice liability on these possessory offenses because there was no evidence that Appellant acted with the intent to promote or facilitate the commission

3

of the offenses, that he solicited the other person to commit the offenses, or aided, agreed, or attempted to aid the other person in planning or committing them. *See*, 18 Pa.C.D. § 306(c). *See also, Commonwealth v. Knox*, 105 A.3d 1194 (Pa. 2014) (rejecting accomplice liability conviction for possessory firearms offenses where someone else possessed the weapon).

## B. FACTS

On September 9, 2013, at approximately 8 p.m, Mr. Rico Lofton, the victim, was watching the Eagles game at his girlfriend's house at 3018 Mifflin Street in Philadelphia. (N.T. 05/07/14 at 136, 149–50; N.T. 05/08/14 at 33–34). The victim walked outside upon hearing an argument in the street and saw his girlfriend's fifteen-year-old brother Carlos arguing with the defendant and his codefendant, Markel Davis.[10] (N.T. 05/08/14 at 27, 34–35). The victim approached the defendants and discovered that they had provided Carlos with heroin and crack-cocaine to sell. (*Id.* at 30, 36–37). The victim took the drugs from Carlos's waistband and told the defendants that they would not get the drugs back. (*Id.* at 36). The defendant responded, "who the F do you think you are," and thereafter the victim and the defendants began arguing for approximately five minutes. (*Id.* at 38–39, 42).

According to the victim, every time that codefendant Davis said something, the defendant would "cosign" the codefendant's statements. (*Id.* at 41). The codefendant demanded of the victim "We want our shit back," to which the victim responded, "You ain't getting your shit back." (*Id.* at 40–41). The victim then told the defendants that he was going to flush the drugs down the toilet, to which the codefendant threatened "Oh, we got something for you" and the defendant added "Say no more." (*Id.* at 41, 43, 107).

---

[10] The defendant and Mr. Davis (hereinafter the "defendants") were tried and convicted together as accomplices and conspirators to the above shooting.

4

Eventually, once the argument ended, the defendants rode away, side-by-side, on their bicycles. (*Id.* at 44–45). The victim watched the defendants ride away for a short while and then turned to walk towards Carlos. (*Id.*). As the victim walked towards Carlos, he heard several gunshots and turned around to see a flash coming from the codefendant's direction. (*Id.*). Nobody else was in the area near the defendants when the shots were fired. (*Id.* at 46). One of the gunshots hit the victim in his right front bicep, and the bullet exited through the rear of his bicep. (*Id.* at 114–16).

The night of the shooting was not the only time that the victim had met the defendants concerning Carlos's drug dealing. (N.T. 05/08/14 at 27–33). Approximately two weeks prior to the shooting, the victim's girlfriend's mother asked the victim to talk to Carlos (the victim's "little brother") because Carlos had been selling drugs. (*Id.* at 27–28). At that time, the victim had some experience selling narcotics, as he had previously pled guilty on two separate occasions to dealing drugs in south Philadelphia. (*Id.* at 23). When the victim confronted Carlos, he learned that Carlos possessed some crack-cocaine, which he received from two men whom Carlos called "Duda" (the defendant) and "Markel" (the codefendant). (*Id.* at 28, 30, 57). With Carlos's assistance, the victim met with the defendants to discuss Carlos's dealing. (*Id.* at 30). This meeting occurred during the day time, with the defendants standing side-by-side, faces uncovered, approximately four feet away from the victim. (*Id.* at 31). The victim asked the defendants to leave Carlos alone because he was too young to deal drugs, and insisted that Carlos give the cocaine back to the defendants. (*Id.* at 30). The codefendant responded that he respected the victim's request and the conversation ended on good terms. (*Id.* at 32–33). The victim and the defendants then "fist pumped" and parted ways. (*Id.* at 33).

5

After being shot, the victim returned to his girlfriend's house at 3018 Mifflin Street, leaving a trail of blood on the floor of the house as well as on his shoes. (*Id.* at 50–51, 172). Shortly thereafter, Officers Robert Ellis and Cyrus Pollard of the Philadelphia Police Department responded to the scene. (N.T. 05/07/14 at 136–136). Officer Ellis entered the house and saw the victim bent over, holding his arm, screaming and crying in pain. (*Id.* at 140–42). The victim stated to Officer Ellis that he was shot, and Officers Ellis and Pollard drove the victim to the emergency room at the Hospital of the University of Pennsylvania in their police vehicle. (*Id.* at 141, 143–45).

Once at the hospital, Officer Pollard escorted the victim to the emergency room for treatment. (*Id.* at 179–80). During treatment, a package of drugs fell out of the victim's pocket. (*Id.* at 185–86). The package contained nine ziplock baggies of heroin, each stamped with the letters "mpire," and three yellow-tinted ziplock baggies containing crack-cocaine. (*Id.* at 184). The victim was then arrested for possession of the narcotics, but was not questioned that evening about the shooting because he was under medication. (N.T. 05/08/14 at 55–56, 157).

The next evening Detective John Landis of the Philadelphia Police Department interviewed the victim at the hospital about the shooting. (*Id.* at 146, 159–160, 165). Before speaking to the victim about the shooting, Detective Landis showed him two sets of photo arrays. (*Id.* at 161–63). In the second set of photo arrays, the victim identified the defendant as one of the shooters. (*Id.* at 164).[11] In his signed statement to the detectives, the victim said the defendant was on the "[b]ottom row, last male on the right. He was doing all the talking." (*Id.* at 64). The victim also specifically stated that the defendant was "the guy who shot [him] last night." (*Id.* at 162, 164). The victim later testified at trial that he was sure the defendants were the two who shot him. (*Id.* at 69).

---

[11] Upon reviewing the first photo array, the victim identified the codefendant as the other shooter. (N.T. 05/08/14 at 161–62).

6

After the defendant was arrested but prior to the defendant's trial, the defendant made an assortment of prison calls. (N.T. 05/09/14 at 67–70). In one of these calls, on September 19, 2013, ten days after the shooting, the defendant stated to a person at his mother's house: "Did she [the defendant's mother] go down . . . down on 31st Street [near the victim's girlfriend's house at 3018 Mifflin Street]. Listen, I'm gonna need you to go there and tell them that . . . me and cuz had nothing to do with it and tell em that we cut em a check . . . He [referring to Carlos] could say it was like a misunderstanding and all that . . . I need y'all to holler at them." (Com. Exh. C-37).[12] The next day, the defendant stated to the same person: "You did that job for me I ask you yesterday . . . Just keep trying to see what's up . . . Just see what's up with that John." (Id.).

Police recovered three 9 millimeter fire cartridge casings (FCC's) from the crime scene approximately thirty minutes after the shooting. (N.T. 05/08/14 at 121, 133, 139). As a result of the shooting, the victim suffered a right humerus fracture in his bicep, and his right arm was placed in long arm cast. (Id. at 114–16). The front of his right arm has since scarred from the bullet wound. (Id. at 55, 100, 107).

## C. DISCUSSION

### 1. Sufficiency of the Evidence – Aggravated Assault

The defendant challenges the sufficiency of the evidence for his conviction of aggravated assault because, according to the defendant, the evidence only showed the defendant's "mere presence" during the shooting and therefore the defendant could not be convicted of aggravated assault based on accomplice liability. This argument is baseless. A conviction is sufficient as a matter of law if, after accepting all the evidence submitted at trial as true in the light most favorable to the Commonwealth, there is sufficient evidence for the fact-finder to find every element of the

---

[12] As of the date of this Opinion, the phone calls have not been transcribed.

7

crime beyond a reasonable doubt. *Commonwealth v. Matthews*, 870 A.2d 924, 928 (Pa. Super. 2005).

"A person is an accomplice of another person in the commission of an offense if: (1) with the intent of promoting or facilitating the commission of the offense, he: (i) solicits such other person to commit it; or (2) aids or agrees or attempts to aid such other person in planning or committing it." 18 Pa.C.S. § 306. "[T]wo prongs must be satisfied for a person to be labeled an 'accomplice.' First, there must be evidence that the person intended to aid or promote the underlying offense. Second, there must be evidence that the person actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. Further, a person cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the person intended to aid in the commission of the underlying crime, and then aided or attempted to aid." *Commonwealth v. Adams*, 39 A.3d 310, 324 (Pa. Super 2012), quoting *Commonwealth v. Rega*, 933 A.2d 997, 1015 (Pa. 2007). "[T]he least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice." *Commonwealth v. Causey*, 833 A.2d 165, 173 (Pa. Super 2003), quoting *Commonwealth v. Graves*, 463 A.2d 467, 470 (Pa. Super 1983).

In the instant case, there is no doubt that the defendant intended to aid his codefendant in committing aggravated assault by shooting the victim, and then did in fact aid the codefendant in doing so. *See Causey*, 833 A.2d at 173. During the five minute argument between the victim and the defendants, the defendants demanded to get their drugs back. (N.T. 05.08/14 at 40–41) (victim's testimony that codefendant Davis stated "We want our shit back," to which the victim responded "You ain't getting your shit back"). When the victim told the defendants that he planned to flush their drugs down the toilet, codefendant Davis threatened the victim by saying "Oh, *we*

8

*got something for you.*" (*Id.*) (emphasis added). Quieting his codefendant, as if not to reveal the codefendant's gun so close to the victim, the defendant stated "Say no more" and the two defendants bicycled away from the victim, side-by-side. (*Id.* at 41, 43–45, 107). Only moments later, once the victim turned his back on the defendants, codefendant Davis shot at the victim three to five times. (*Id.* at 44–45).

Viewing the evidence in the light most favorable to the Commonwealth, these facts amply demonstrate the defendant's *intention* to help conceal codefendant Davis's firearm from the victim. Likewise, these facts demonstrate that the concealment *aided* codefendant Davis's shooting because the shooting did not occur until the victim unknowingly turned away from an armed drug dealer. Though during the shooting the defendant was not looking toward the victim, the defendant's concealment of codefendant Davis's gun through the words "Say no more" undoubtedly made codefendant Davis's task in committing aggravated assault easier and more probable. *See Adams*, 39 A.3d at 324, quoting *Commonwealth v. Murphy*, 844 A.2d 1228, 1234 (Pa. 2004) ("With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime.").

Additionally, only ten days after the shooting, the defendant demonstrated his own consciousness of guilt; in a prison phone call to his mother, the defendant asked his mother, and another person in his mother's house, to "holler at" Carlos (the witness to the shooting) and his family, tell them that Carlos could say "it was like a misunderstanding and all that" and that, if Carlos and his family cooperated, "we," meaning the defendant and codefendant, would "cut em a check." *Commonwealth v. Johnson*, 838 A.2d 663, 680 (Pa. 2003) ("This Court has long recognized that any attempt by a defendant to interfere with a witness's testimony is admissible to show a defendant's consciousness of guilt."); (Com. Exh. C-37). Therefore, the evidence was more

9

than sufficient to support the defendant's conviction for aggravated assault under a theory of accomplice liability.

## 2. Sufficiency of the Evidence – Conspiracy to Commit Aggravated Assault

"In order to sustain a conviction of criminal conspiracy to commit aggravated assault, the Commonwealth need only establish intent to commit or aid in the commission of aggravated assault, an agreement with a co-conspirator, and an overt act in furtherance of the conspiracy." *Commonwealth v. Thomas*, 65 A.3d 939, 944 (Pa. Super 2013). With respect to his conviction for conspiracy to commit aggravated assault, the defendant argues that the evidence was insufficient for the jury to conclude that the defendant formed an agreement with co-defendant Davis.[13] This argument is baseless.

"The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Melvin*, 103 A.3d 1, 42–43 (Pa. Super 2014). Thus, with respect to the agreement element, "a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation." *Id.*

---

[13] In challenging his conspiracy conviction for aggravated assault, the defendant also argues the evidence was insufficient because it only show his "mere presence" at the scene. As discussed at length above, however, there was more than sufficient evidence for the jury to conclude that the defendant intended to "aid in the commission of aggravated assault" and that he therefore was not "merely present" at the scene of the crime. *Commonwealth v. Thomas*, 65 A.3d 939, 944 (Pa. Super 2013).

10

"Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy." *Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super 2002). Ultimately, "where the conduct of the parties indicates that they were acting in concert with a corrupt purpose in view, the existence of a criminal conspiracy may properly be inferred." *Commonwealth v. Kinard*, 95 A.3d 279, 293 (Pa. Super 2014).

In the instant case, there was more than ample evidence for the jury to conclude that the defendant and codefendant Davis were acting in concert with a corrupt purpose because *all* of the relevant circumstances discussed in *Lambert* are present. *Lambert*, 795 A.2d at 1016–17. First, the record reflects that the defendant and co-defendant Davis have a relationship as business associates. *See id.* at 1016. The victim met with *both* the defendant and codefendant Davis on two separate occasions concerning Carlos's drug dealing. (N.T. 05/08/14 at 27–33. 40–45). Likewise, following the shooting, the defendant told somebody at his house that "we," meaning he _and_ codefendant Davis, would cut Carlos and his family a check if Carlos would only say that the shooting was "a misunderstanding and all that." (Com. Exh. C-37). Similarly, it is undisputed, and the record fully reflects, that the defendant was present at the scene of the crime. *See Lambert*, 795 A.2d at 1016–17; (N.T. 05/08/14 a 27–45 (victim's testimony concerning: (1) the argument preceding the shooting, (2) the defendant's cosigning of the codefendant's statements, and (3) the defendant's location when codefendant Davis shot the victim)).

Moreover, there is ample evidence that the defendant had "knowledge" that his codefendant would shoot the victim (an aggravated assault) and that he "participated" in the conspiracy. *Lambert*, 795 A.2d at 1016–17. The defendant and codefendant engaged in a five

11

minute argument with the victim, demanding the victim to return the defendant's drugs. (N.T. 05/08/14 at 40–41). Throughout this argument, every time that codefendant Davis said something to the victim, the defendant would "cosign" onto the statement in support, as if the defendant and codefendant were working together. (*Id.* at 41). Eventually, codefendant Davis threatened the victim with the words "Oh, *we got something* for you" and the codefendant cosigned by stating "Say no more." (*Id.* at 41, 43, 107) (emphasis added). A jury could easily infer from these statements that *both* the defendant and codefendant Davis *knew* ("*we*") that codefendant Davis had a weapon ("*got something*") that could and would be used to fulfill the codefendant's threat. (*Id.*). Moreover, the defendant's prison call statements – especially the statements where the defendant asked someone at his mother's house to bribe Carlos and Carlos's family with money from <u>both</u> of the defendants in return for a statement from Carlos that the shooting was "a misunderstanding and all that" – indicate that *the defendant believed* he *participated* in the shooting of the victim *with* codefendant Davis.[14] (Com. Exh. C-37).

Therefore, because all four of the "circumstances" discussed in *Lambert* are present, the jury was free to conclude that the defendants were acting in concert with a corrupt purpose (to assault the defendant by gunshot), and that the defendant engaged in a criminal conspiracy. *See Lambert*, 795 A.2d at 1020.

### 3. Sufficiency of Evidence – Firearms Offenses via Accomplice Liability

The defendant's argument that the Commonwealth did not adequately prove the defendant's accomplice liability on all of the firearms offenses is without merit. In analyzing the

---

[14] In his Statement of Matters, the defendant mischaracterizes the contents of the prison calls, claiming that the defendant only stated "Tell him it's a misunderstanding," a statement which may also be consistent with innocence. In fact, in the prison phone calls, the defendant twice requested someone at his mother's house to offer *Carlos* (or his family) *money* to say that the shooting was a misunderstanding. An attempt to bribe a witness to state what the witness otherwise would not say is not consistent with innocence.

12

sufficiency of the evidence for the defendant's accomplice liability for possessory weapons offenses, the Court must consider "whether the evidence and reasonable inferences, taken in the light most favorable to the Commonwealth as the verdict winner, supported a conclusion that [the defendant], acting with the intent to promote or facilitate [the codefendant's] carrying of a concealed firearm, solicited [codefendant Davis] to commit such offense or aided, agreed, or attempted to aid [codefendant Davis] in doing so." *Commonwealth v. Knox*, 105 A.3d 1194, 1197 (Pa. 2014), citing 18 Pa.C.S. § 306(c).

As discussed at length when analyzing the defendant's accomplice liability for aggravated assault, the facts of this case amply demonstrate that the defendant *intended* to facilitate the concealment of codefendant's Davis's firearm from the victim and that such concealment *aided* codefendant Davis in possessing the firearm for later use in an aggravated assault. Specifically, the defendant's statement of "Say no more" *after* codefendant Davis threatened the victim with the words "We got something for you" demonstrates that the defendant knew codefendant Davis had a gun throughout the argument and that the defendant acted to conceal codefendant Davis's gun from the victim until the victim turned away. (N.T. 05/08/14 at 41, 43–45, 107); *see supra Part C.1.* Considering that the defendant also demonstrated his own consciousness of guilt for shooting the victim when he attempted to bribe Carlos (an eyewitness to the shooting) to testify that the shooting was a "misunderstanding," the evidence was more than sufficient to support the defendant's conviction for all of the possessory firearm offenses under a theory of accomplice liability. *See* (Com. Exh. C-37).

### 4. Sufficiency of Evidence—Conspiracy to Commit Firearms Offenses

Finally, the defendant baselessly argues that Commonwealth failed to prove a conspiracy between the defendant and codefendant to possess a firearm. "The general rule of law pertaining

13

to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. The co-conspirator rule assigns legal culpability equally to all members of the conspiracy. *All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action."* Commonwealth v. Galindes, 786 A.2d 1004, 1011 (Pa. Super 2001) (emphasis added), quoting *Commonwealth v. Hannibal*, 753 A.2d 1265, 1274 (Pa. 2000).

This case is indistinguishable from *Galindes*. In *Galindes*, the Superior Court rejected the defendant's challenge to the sufficiency of his convictions for conspiracy to possess firearms offenses because there was no evidence that the defendant fired the gun. As the Superior Court reasoned, "[b]ecause Mr. Ortiz and Mr. Galindes engaged in a conspiracy to commit burglary, the fact that one of them shot at Mr. Rodriguez renders the other equally criminally responsible" for the firearms offenses *Id.* at 101. Thus, in this case, as in *Galindes*, because the Commonwealth proved that the defendants engaged in a conspiracy to commit aggravated assault (with a firearm), the defendant is criminally responsible for "all acts committed by" codefendant Davis in furtherance of that aggravated assault, including the possessory firearms offenses. *See also id.* at 1012 (holding that, because Mr. Ortiz engaged in a conspiracy to commit burglary with Mr. Galindes, Mr. Ortiz was "criminally responsible for all acts committed by Mr. Galindes."). The Commonwealth therefore presented sufficient evidence for conspiracy to commit all of the above firearms offenses.

14

## D. CONCLUSION

For the foregoing reasons, the defendant's convictions should be affirmed.

BY THE COURT:

DENIS P. COHEN, J.

Dated: June 3, 2015